# In the United States Court of Federal Claims

**No. 14-140C**
**Bid Protest**
**(Filed:  February 28, 2014)[1]**
**(Reissued: March 11, 2014)**

```
* * * * * * * * * * * * * * * * * * * * * * * * *  *
                                                   *
BANNUM, INC.,                                      *
                                                   *
        Plaintiff,                                 *
                                                   *
                                                   *   Post-Award Bid Protest; Temporary
        v.                                         *   Restraining Order; Preliminary
                                                   *   Injunction; Likelihood Of Success On
THE UNITED STATES,                                 *   The Merits; Standing; Standard of
                                                   *   Review; Qualified Pricing; Nonresponsive
        Defendant,                                 *   Offer; Waiver; Agency Protest;
                                                   *   Relaxation Of Solicitation Requirement;
        and                                        *   Material Misrepresentation; Failure To
                                                   *   Conduct Discussions.
DISMAS CHARITIES, INC.,                            *
                                                   *
        Intervenor.                                *
                                                   *
* * * * * * * * * * * * * * * * * * * * * * * * *  *
```

Joseph A. Camardo, Jr., Camardo Law Firm, PC, 127 Genesee Street, Auburn, NY 13021, for Plaintiff.

Stuart Delery, Bryant G. Snee, Donald E. Kinner, and Russell J. Upton, United States Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Post Office, Washington, D.C. 20044, for Defendant.  Devin Wolak, United States Department of Justice, Civil Division, Commercial Litigation Branch, Of Counsel.  Seth Bogin and William Robinson, United States Department of Justice, Federal Bureau of Prisons, Commercial Law Branch, Of Counsel.

Alex D. Tomaszczuk, Pillsbury Winthrop Shaw Pittman LLP, 1650 Tysons Boulevard, McLean, VA 22102-4859, for Intervenor.  Daniel S. Herzfeld, Pillsbury Winthrop Shaw Pittman LLP, 1650 Tysons Boulevard, McLean, VA 22102-4859, Of Counsel.

---

[1]  The Court issued this opinion under seal on February 28, 2014, and directed the parties to file proposed redactions by March 5, 2014.  On March 11, 2014, the Court held a sealed telephonic conference to hear argument on the parties' proposed redactions.  As a result of the colloquy during the conference, the Court publishes this redacted opinion.  Redactions are indicated by brackets "[  ]."

_____

**OPINION AND ORDER DENYING TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION[2]**

_____

**WILLIAMS**, Judge.

This post-award bid protest comes before the Court on Plaintiff Bannum, Inc.'s ("Bannum") motion for a preliminary injunction.[3]  Bannum challenges the terms of a solicitation issued by the United States Department of Justice, Federal Bureau of Prisons ("BOP") and BOP's award of a contract to Intervenor Dismas Charities, Inc. ("Dismas").  Bannum argues that the solicitation was defective because BOP required compliance with the Prison Rape Elimination Act of 2003 ("PREA") without giving guidance regarding the implementation and pricing of this requirement.  Bannum further contends that BOP improperly relaxed a mandatory solicitation requirement that performance commence within 120 days of award and that Dismas materially misrepresented its ability to commence performance within that time frame.

Upon consideration of the record developed at an evidentiary hearing on the parties' motions, the Court finds that Bannum has failed to demonstrate a likelihood of success on the merits and denies Bannum's motion for a TRO/preliminary injunction.

## Findings of Fact[4]

### The Solicitation

On February 22, 2012, BOP issued solicitation number RFP-200-1168-SE ("Solicitation") requesting proposals for Residential Re-entry Center ("RRC") services for male and female Federal offenders located in the Tupelo, Mississippi area.  PX 1 at 000001, 000047. The awardee would provide housing and "furnish all personnel, management, equipment, supplies, and services necessary for performance of all aspects of the contract," including operation of RRC in a manner consistent with BOP's mission to "protect society by confining offenders in . . . community-based facilities that are safe, humane, cost efficient, appropriately

_____

[2]  This opinion memorializes and further explains the Court's oral ruling of February 26, 2014.  See Tr. (Feb. 26, 2014).

[3]  Because Bannum sought to enjoin a contract award set to commence on March 1, 2014, with the agency's transition beginning on February 27, 2014, the Court expedited consideration of Bannum's motion and treated it as a motion for a temporary restraining order ("TRO")/preliminary injunction.

[4]  These findings of fact are derived from the record developed during the February 24, 2014 evidentiary hearing on Plaintiff's motion for a TRO/preliminary injunction, including the testimony of the contracting officer, Stefanie Skroch, and the February 23, 2014 declaration of Jon Gustin, as well as Plaintiff's September 4, 2013 protest with the Government Accountability Office ("GAO").  The Court uses "PX" and "DX" to designate Plaintiff's and Defendant's exhibits, respectively.  The Administrative Record has not been filed.

secure, and provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens." Id. at 000047.  Bannum is the incumbent.

The Solicitation called for "an indefinite delivery, requirements type contract, with firm-fixed unit prices" to house an estimated 40 full-time offenders for a two-year base period, with three option years. Id. at 000006.  Section B of the Solicitation requested unit pricing for these services on a daily basis per inmate.  The quantity of inmate days for the base years was 29,200 and 14,640 for each option year.  Id.  The Solicitation incorporated by reference Federal Acquisition Regulation ("FAR") § 52.233-3 "Protest after Award (Aug 1996)." Id. at 000017.

The Solicitation addressed the timing of commencement of performance as follows:

> The Contractor's [RRC] facility must be fully operational and ready for performance to begin within 120 days after the date of contract award.  (For the purpose of this solicitation, "contract award" is defined as the date the award document . . . is signed by the Contracting Officer).
>
> * * *
>
> The anticipated period(s) of performance are based on the assumptions that funds are available and the Government will make award by October 4, 2012.  The initial performance period will depend on the actual date of award and the issuance of a written award or acceptance of offer mailed or otherwise furnished to the successful offeror to result in a binding contract.

Id. at 000011 § F.3.  In describing the content of the Technical/Management proposals in section L, entitled "Instructions and Conditions and Notices to Offerors," subsection L.6(j) elaborated on the 120-day start date:

> <u>Contract performance will be 120 days after the date of contract award, unless otherwise specified by the Contracting Officer</u>.  Subsequent to a contract award and prior to the performance date (<u>usually</u> not more than 120 days following award), a representative of the Bureau of Prisons will again inspect the successful offeror's Performance Facility and Programs to determine actual compliance with all requirements of the Statement of Work.

Id. at 000033-34 (emphasis added).

BOP was to evaluate proposals with regard to Past Performance, Technical/Management, and Price, weighing Technical/Management and Past Performance combined significantly greater than Price.   Id. at 000036 § M.5.   As between Past Performance and Technical/Management, BOP was to accord Past Performance greater importance.   In circumstances where the evaluation of competing proposals in the Technical/Management and Past Performance areas became more equal in rating, Price became more important in "selecting the best value for the Government." Id.  The Technical/Management criterion included five factors, 1) Site Location, 2) Accountability, 3) Programs, 4) Facility, and 5) Personnel. Id. at 000037 § M.5 ¶ 2.0.  BOP was to evaluate each with equal importance. Id.  Site Location had two subfactors, 1) Site Validity and Suitability and 2) Community Relations Program. Id.  BOP was to evaluate each with equal importance. Id.  Proposed facilities were to be evaluated with

3

regard to overall quality, the degree of compliance with applicable local, state, national health, safety, environmental laws, regulations, Executive Orders, and building codes.  Id. at 000038 § M.5 ¶ 2.4.

The Solicitation described price evaluation as follows:

The Government will not specifically score or rate the offeror's price.  The Government will evaluate the offeror's price (the inmate day rate) to ensure it is reasonable.  The offeror's evaluated price will be assessed against the evaluation results of the Non-Price areas [of Past Performance and Technical/Management] in conducting possible tradeoff analysis and determining the best value to the Government.

Id. at 000038 § M.5 ¶ 3.0.

Each of the evaluation factors and subfactors were to be assigned "an overall color/adjectival rating" to depict how well the offeror met solicitation requirements as follows:

BLUE - Very Good:  Offeror's proposal meets and exceeds the requirements of the solicitation.  Their proposal shows they have a very good solution for meeting the needs and objectives of the program.  One or more significant strengths exist.  Weaknesses may exist, but none are considered significant and are easily correctable.

GREEN - Acceptable:  Offeror's proposal meets the minimum requirements of the solicitation.  Their proposal shows they have an acceptable solution for meeting the needs and objectives of the program.  Strengths and weaknesses may exist.  The weaknesses are correctable.

YELLOW - Poor:  Offeror's proposal does not meet some of the requirements of the solicitation.  Their proposal shows they have a poor solution for meeting the needs and objectives of the program.  Weaknesses outweigh any strengths that may exist.  The weaknesses are difficult to correct.

RED - Unacceptable:  Offeror's proposal fails to meet the requirements of the solicitation.  Their proposal shows they have an unacceptable solution for meeting the needs and objectives of the program.  There are numerous weaknesses.  The weaknesses will be very difficult to correct or are not correctable.

Id. at 000036-37 § M.5.

The Solicitation also informed offerors that BOP would evaluate each offeror's Technical/Management proposal to determine "the soundness and credibility of the offeror's plan for ensuring operational availability within 120 days after contract award," and required:

Offerors shall submit their plan for complying with the 120 day availability requirement.  This plan should include a sequential list for the project that will demonstrate when major construction elements will be started and how long it is estimated to take to complete in order to demonstrate an ability to achieve a 120

day availability of the facility.  This plan shall not exceed 5 pages.  Offeror shall ensure the plan is relevant to the requirements under this solicitation.

Id. at 000205.  The Solicitation also required the awardee to maintain and make available to BOP documents showing compliance with applicable laws, regulations, Executive Orders, and building codes.  Id. at 000068-69.

On February 28, 2013, BOP issued Amendment 005 to the Solicitation, stating in pertinent part:

1.  In Section C, Statement of Work, Chapter 2 - Personnel, Page 20, Section 6. Sexual Abuse Information, after the second paragraph, the following paragraph is added:

"P.L. 108-79, Prison Rape Elimination Act of 2003 (PREA)[,] seeks to eliminate sexual assaults and sexual misconduct of offenders in correctional facilities to include all community based facilities.  Administration must maintain a zero-tolerance for sexual abuse, specific policy that addresses PREA compliance will be maintained by contractor.  Facility must be in full compliance with PREA standards that apply to Community Confinement Facilities.  Compliance with standards will be measured by use of assessment tools such as Published by the National Prison Rape Elimination Commission, "Standards for the Prevention, detection, response, and monitoring of sexual abuse in Community [Corrections,"] [www.ncjrs.gov/pdffiles1/226683.pdf,] subsequent revisions, or any other monitoring tool as adopted by the BOP.  PREA coordinator must be designated in writing and submitted to the BOP.  In accordance with provisions of PREA, contractor must be audited by a certified PREA compliance auditor at no cost to the BOP.  Copies of all audit material will be provided to the BOP."

PX 2 at 000150-51 § 14.  Amendment 005 did not revise the evaluation or pricing criteria, and the evaluation criteria set forth in the Solicitation did not encompass the PREA requirements incorporated by Amendment 005.  See id.; see also PX 1 at 000036-38.

**The Proposals**

**Initial Proposals**

On April 23, 2012, Bannum and Dismas each submitted Technical/Management, Business, and Past Performance proposals.  PX 3, 4.  Bannum also submitted the following price proposal:

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|----------|-------------------|----------|------|------------|--------|
| 0001 | To provide Residential Re-Entry Center (RRC) Services located in the Tupelo, Mississippi Area (Within Lee County) Base Year Period: 02/01/2013 through 01/31/2015 | 29,200.000000 | DY | $[     ] | $[          ] |

| | | | | | |
|---|---|---|---|---|---|
| 0001a | Option Year 1: 02/01/2015 through 01/31/2016 | 14,600.000000 | DY | $[    ] | $[          ] |
| 0001b | Option Year 2: 02/01/2016 through 01/31/2017 | 14,640.000000 | DY | $[    ] | $[          ] |
| 0001c | Option Year 3: 02/01/2017 through 01/31/2018 | 14,600.000000 | DY | $[    ] | $[          ] |

See PX 1 at 000006; PX 31 at 31.  As the incumbent, Bannum's 120-day availability plan anticipated minor renovations to its existing facility, stating that while Bannum believed that its facility could "become operational under the follow-on contract easily within a [          ]," "Bannum ha[d] the ability to continue to provide services during the 120-day availability plan." PX 3 at 000130.  Bannum's plan also included a time frame for "individual required tasks to be completed" within [                    ] and indicated the number of "post contract award days" a given task would take.  Id. at 000133.  Bannum's proposal further stated:

> This schedule is anticipated and cannot account for delays and forces that cause delay of any particular item or the whole schedule including:  scheduling requirements/unforeseen impediments/delays of [City / Parish / State / Federal] officials (including but not limited to - building permits reviews, vacation schedules, inspection schedules, and others), weather, forces of nature, acts of war, terrorism, strikes, civil unrest and other issues of force majeur.

Id. at 000134 (emphasis omitted).

Dismas submitted the following price proposal:

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | To provide Residential Re-Entry Center (RRC) Services located in the Tupelo, Mississippi Area (Within Lee County)<br><br>Base Year Period: 02/01/2013 through 01/31/2015 | 29,200.000000 | DY | $[    ] | $[          ] |
| 0001a | Option Year 1: 02/01/2015 through 01/31/2016 | 14,600.000000 | DY | $[    ] | $[          ] |
| 0001b | Option Year 2: 02/01/2016 through 01/31/2017 | 14,640.000000 | DY | $[    ] | $[          ] |
| 0001c | Option Year 3: 02/01/2017 through 01/31/2018 | 14,600.000000 | DY | $[    ] | $[          ] |

See PX 1 at 000006; PX 31 at 31.

In its 120-day plan, Dismas announced that it would offer BOP a new facility "constructed from the ground up." DX 5 at 1. Dismas stated:  "When constructed, the facility will comply with all applicable local, state, and national health, safety, environmental laws, regulations and Executive Orders, and building codes." Id. The plan further stated that Dismas "will maintain and make available to the BOP" current documentation of all required licensing, permits and inspections, and included the following schedule:

*Schedule/List of Major Construction Elements.*  Our project team will complete construction and have the facility operational and ready for contract performance according to the terms of the solicitation.  The following scheduling identifies a list of major construction elements, their start date and their duration in calendar days.  The schedule assumes contract award on October 4, 2012, as indicated in Section F.3 (e) of the solicitation.  If award is made before or after that date, the schedule shall be adjusted to accommodate the different award date but still maintain 120 days from contract award to performance date.

| [          ] | [   ] | [          ] | [      ] |
|---|---|---|---|
| [                              ] | [     ] | [    ] | |
| [              ] | [     ] | [   ] [ | |
| | | | ] |
| [         ] | [     ] | [    ] | |
| [         ] | [     ] | [    ] | |
| [         ] | [     ] | [    ] | |
| [       ] | [     ] | [    ] | |
| [         ] | [     ] | [    ] | |
| [           ] | [     ] | [    ] | |
| [          ] | [     ] | [    ] | |
| [           ] | [     ] | [    ] | |
| [               ] | [     ] | [    ] | |
| [                ] | [     ] | [    ] | |
| [                   ] | [     ] | [    ] | |
| [            ] | [     ] | [    ] | |
| [               ] | [     ] | [    ] | |
| [              ] | [     ] | [    ] | |
| [                 ] | [     ] | [    ] | |
| [             ] | [     ] | [    ] | |
| [            ] | [     ] | [    ] | |
| [           ] | [     ] | [    ] | |
| [           ] | [     ] | [    ] | |
| [            ] | [     ] | [    ] | |
| [          ] | [     ] | [    ] | |
| [           ] | [     ] | [    ] | |
| [            ] | [     ] | [    ] | |
| [                ] | [     ] | [    ] [ | |
| | | | ] |
| [               ] | [     ] | [    ] | |
| [                 ] | [     ] | [    ] [ | |
| | | | ] |

<u>Id.</u> at 1, 5 (emphasis in original).

**Final Proposal Revision # 1**

On August 23, 2012, BOP issued a request for a Final Proposal Revision, requesting that each offeror review its price proposal and submit a final proposal revision. <u>See</u> PX 15 at 1. BOP's request also stated "that the Government intends to make award without further revisions." <u>Id.</u> at 2. Bannum and Dismas each submitted a response to BOP's request. <u>See</u> PX 31 at 31.

**Final Proposal Revision # 2**

On February 14, 2013, BOP issued a request for Final Proposal Revision # 2. Pl.'s Mem. Support Mot. Prelim. Inj. ("Pl.'s Mot.") 3, Feb. 19, 2014. Bannum and Dismas each submitted a response. PX 20; <u>see</u> PX 31 at 31.

Dismas did not revise its prices but did revise and update its 120-day plan. PX 20 at 1, 2. Dismas advised BOP that the City of Tupelo had approved Dismas' "construction documents and drawings" for the proposed facility, and stated, "Our Development Team is prepared to start construction of the new facility immediately upon contract award and open the facility with[in] 120 days." <u>Id.</u> at 2 ¶ 3(b)(ii).

**Final Proposal Revision # 3**

On February 28, 2013, BOP issued request for Final Proposal Revision # 3, requesting that offerors sign and return Amendment 005 to the Solicitation, and stating "that the Government intends to make award without further revisions." Def.'s Mot. Dismiss ("Def.'s Mot.") App. A196-97, Feb. 23, 2014; <u>see</u> PX 2.

In its March 6, 2013 response, Dismas stated:

[

]

PX 24 (emphasis in original).

On March 7, 2013, Bannum submitted a letter to the contracting officer labeled "Final Proposal Revision #3 and AGENCY PROTEST." PX 25 at 000001-09. Bannum submitted the following price proposal:

|  |  |  |
|---|---|---|
| Base Period | [ | ] |
| Option Year 1 | [ | ] |
| Option Year 2 | [ | ] |
| Option Year 3 | [ | ] |

<u>Id.</u> at 00001. However, Bannum added an explanatory footnote, stating in pertinent part:

However, these prices do not, and cannot, reflect any consideration for the effects of Amendment 5 that BOP presented with this [Final Proposal Revision] #3. As is discussed elsewhere in this response to the [Final Proposal Revision],

8

it is not remotely possible to begin to attempt to formulate a cost or price proposal for the addition of PREA and its requirements at this point in time and with the limited amount of information we have been given, not to mention the lack of any technical guidance on this new requirement. Accordingly, an enormous amount of information is required prior to pricing this new contract requirement which itself may require untold amounts of extra work time, services, efforts, and perhaps the necessity for consultants, auditors, not to mention additional executive and management level staffing and effort.   Bannum hereby requests that discussions continue on this requirement and that we be provided an adequate opportunity to respond to the new requirement and to amend our proposal as needed.

Id. at 000001 n.1.

As it had "numerous questions regarding the PREA portion" of Amendment 005, Bannum requested "additional discussions regarding the requirements of this amendment prior to its final execution and incorporation into this solicitation because we have no information, experience or guidance from BOP on this completely new requirement." Id. at 000002. For example, Bannum requested additional information regarding the following questions:

Has the BOP previously implemented PREA in Residential Reentry Center contracting and programs?

If so, please provide a copy or citation to the policy or Program Statement or other document that describes the implementation, use and compliance guidelines for PREA compliance and provide discussion on the issue of BOP's expectations with respect to PREA and its extensive compliance requirements;

If BOP has not implemented PREA or does not have a policy or Program Statement or other documentation as described above, please provide detailed information   as   to BOP's interpretation of and plan for achieving PREA compliance within the time frames required.

Id. at 000003.

Bannum also requested guidance regarding "BOP's position, specific approach, contract specifications, and[] plan and policies that outline PREA compliance," the interaction between BOP's Employee Standards of Conduct and the PREA requirements, and the responsibilities of a contractor in implementing the requirements set forth in an outline authored by the National Prison Rape Elimination Commission entitled "Standards For The Prevention, Detection, Response, And Monitoring Of Sexual Abuse In Community Corrections." Id. at 000004-05.  In conclusion, Bannum stated:

Certainly, there must be a great deal of discussion on this issue prior to execution and full implementation of Amendment 5.

* * *

In the event BOP should decide not to provide additional information, discussions, and technical guidance, and BOP requires that Bannum execute the modification with the PREA [requirements] contained therein without the ability to fully understand the ramifications of the PREA [requirements] on the RRC solicitation, contract and SOW, then Bannum hereby protests the inclusion of the PREA [requirements] as well as the BOP decision to require the same without any information, discussion, or technical guidance.   Stated differently, we hereby protest the inclusion of the PREA portion of Amendment 5 into the solicitation subject to the discussion herein and lack of information, specifications and technical guidance from BOP.

Id. at 000005-06 (emphasis omitted).

Bannum executed and returned Amendment 005 with its response, but included a handwritten note on the Amendment stating:  "Subject to and limited by Bannum's response to [Final Proposal Revision] # 3 dated 3/7/2013 and submitted herewith; also, subject to Bannum's reservation of all rights and protest."  Id. at 000008.

### Final Proposal Revision # 4

On July 3, 2013, BOP issued request for Final Proposal Revision # 4 without responding to Bannum's March 7, 2013 "AGENCY PROTEST."  Def.'s Mot. App. A204-05.  BOP requested that each offeror review its price proposal and submit a final proposal revision.  Id. at A204.  BOP's request also stated "that the Government intends to make award without further revisions."  Id. at A204-05.

Dismas responded to Final Proposal Revision # 4 and revised its unit pricing as follows:

| | |
|---|---|
| Base Period | $68.00 |
| Option Year 1 | $70.72 |
| Option Year 2 | $73.56 |
| Option Year 3 | $76.52 |

See PX 31 at 31.

On July 10, 2013, Bannum submitted a response to BOP's request for Final Proposal Revision # 4, listing its pricing proposal as:

| | | |
|---|---|---|
| Base Period | [ | ] |
| Option Year 1 | [ | ] |
| Option Year 2 | [ | ] |
| Option Year 3 | [ | ] |

Def.'s Mot. App. A199-200.  Unlike its response to BOP's request for Final Proposal Revision # 3, Bannum did not denominate this response as an "AGENCY PROTEST."  Def.'s Mot. App. A199.   However, Bannum repeated verbatim its footnote requesting discussions and communicating that its prices did not reflect pricing for PREA compliance.  Id. at n.1; see PX 25 at 000001 n.1.

No further discussions were conducted.

**Source Selection Decision**

On July 19, 2013, the contracting officer issued a Source Selection Decision ("SSD") rating the proposals as follows:

|  | Dismas | Bannum |
|---|---|---|
| Past Performance | Blue/Very Good | Blue/Very Good |
| Technical/Management | Blue/Very Good | Green/Acceptable |
| Price | $5,212,222.40 | $5,339,200.00 |

PX 31 at 1, 8, 15, 23, 31, 35.  The SSD further stated in pertinent part:

Factor 4 - Facility:

Bannum submitted the RRC Certificate of Compliance, floor plans, site plans, and facility photographs as required.  These were acceptable.  Bannum states they can be ready to perform within **[          ]**.

\* \* \*

Factor 4 - Facility:

Dismas submitted the RRC Certificate of Compliance, floor plans, site plans, and facility photographs as required.  These were acceptable.  Dismas states they can be ready to perform within the 120-day compliance period.  This is acceptable.

Id. at 20, 29 (emphasis omitted).  The contracting officer concluded:

Dismas submitted the lowest-priced proposal and, based on a qualitative analysis, received the highest rating for the non-price portions of [its] proposal.  Award to Dismas provides the best value to the BOP.

\* \* \*

**. . . [C]ontract award shall be made to Dismas.**

Id. at 36 (emphasis in original).

**Justification For Other Than Full And Open Competition**

On July 24, 2013, the Senior Contracting Officer for Residential Re-entry Contracting issued a Justification For Other Than Full And Open Competition.  PX 32.  Noting that Bannum's contract with BOP was set to expire on July 31, 2013, the Justification stated that BOP intended to issue Bannum a contract "under unusual and compelling urgency for the period from August 1, 2013 through January 31, 2014 for RRC services."  Id. at 1 ¶ 3.  The Justification further stated:

RRC services are required immediately in the Tupelo, Mississippi area to preclude disruption of the orderly running of the RRC program and to protect the Government's interest.  Delay in award of the contract would result in serious injury to the BOP in securing the care and custody of inmates.  This contract will allow for a continuity of services while the new contract requirement is being awarded.

Id. at 4 ¶ 9.

On July 31, 2013, BOP executed a contract with Bannum to continue RRC services in Tupelo under Justification for Other than Full and Open Competition procedures, for a base period from August 1, 2013 to November 30, 2013, with two one-month option periods.  Pl.'s Mot. Ex. 2.

**The Award And Dismas' Building Permit**

BOP awarded Dismas the contract on August 26, 2013 ("Contract").  PX 34.  Exercising her discretion under Section L.6(j), the contracting officer set February 1, 2014, as the Contract start date.  Id. at 000001.  The contracting officer elaborated:

The reason for the change [beyond the 120 days] was due to BOP's usual practice of commencing contract performance on the first day of the month following the 120-day deadline, as a method to streamline contract administration tasks and simplify budgeting and accounting.  Here, the 120 days ended the day before a federal holiday (Christmas) and the first day of the next month fell on another federal holiday (New Year's Day).  To avoid moving inmates on Christmas Eve or New Year's Day, and since Bannum's incumbent contract in Tupelo would run through February 1, 2014, the contracting officer unilaterally set February 1 as the start date.

Def.'s Mot. App. A269-70 (citations omitted).

On August 27, 2013, the City of Tupelo issued Dismas a building permit for the proposed RRC facility.  PX 36.

**Bannum's Protest and BOP's Stop Work Order**

On September 4, 2013, Bannum filed a protest with the Government Accountability Office ("GAO"), claiming:  "(1) the BOP improperly relaxed the Solicitation requirements for Dismas and not for other offerors in the competitive range; ([2]) Dismas' offered price was unreasonably low; and, ([3]) the BOP's assessment of Bannum's Technical/Management rating was unreasonable and was in violation of the stated Evaluation Criteria."  Def.'s Mot. App. A258.  Bannum's GAO protest did not challenge the incorporation of the PREA requirements into the Solicitation through Amendment 005.

Bannum's GAO protest triggered an automatic stay pursuant to the Competition in Contracting Act, 31 U.S.C. § 3553(d)(3).  On September 6, 2013, BOP issued Dismas a stop work order via Contract Modification 0001, stating:

As a result of protest B-408838.1, filed with the Government Accountability Office, a Stop-Work Order is issued.  All Residential Reentry Center services, subcontracting, and all actions pertaining to this contract are suspended.  All performance must be stopped from the effective date of the stay of performance.

All other terms and conditions remain the same.

DX 30 at 1-2.  To continue RRC services in Tupelo through December 31, 2013, BOP exercised its option on Bannum's July 31, 2013 contract.  Pl.'s  Mot. Ex. 3.

On December 11, 2013, GAO denied in part and dismissed in part Bannum's protest, and on December 12, 2013, the contracting officer issued Dismas Contract Modification 0002 to cancel the stop work order.  Def.'s Mot. App. A267, A272; DX 31 at 1.

## March 1, 2014 Performance Start Date

Pursuant to FAR § 52.233-3(b), BOP's contracting officer contacted Dismas to adjust the performance start date in light of the stop work order.  The contracting officer credibly testified that she chose March 1, 2014, as the new Contract start date based upon Dismas' representation as to when it could have the facility operational subsequent to the stop work order.  FAR § 52.233-3(b), which was incorporated into the Solicitation by reference, states:

If a stop-work order issued under this clause is canceled either before or after a final decision in the protest, the Contractor shall resume work.  The Contracting Officer shall make an equitable adjustment in the delivery schedule or contract price, or both, and the contract shall be modified, in writing, accordingly, if--

(1) The stop-work order results in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract; and

(2) The Contractor asserts its right to an adjustment within 30 days after the end of the period of work stoppage; provided, that if the Contracting Officer decides the facts justify the action, the Contracting Officer may receive and act upon a proposal submitted at any time before final payment under this contract.

By mutual agreement between BOP and Dismas, the contracting officer issued Dismas Contract Modification 0003 on January 17, 2014, to extend the performance start date from February 1, 2014 to March 1, 2014.  PX 45.

To maintain RRC service in Tupelo from January 1, 2014 through February 28, 2014, BOP again exercised its options to extend Bannum's July 31, 2013 contract through February 28, 2014.  Pl.'s Mot. Ex. 4, 5.

## Procedural History

On February 19, 2014, Bannum filed a complaint alleging that 1) BOP relaxed the Solicitation's 120-day post-award requirement for commencing performance, 2) Dismas materially misrepresented its ability to timely commence performance within 120 days of award

and 3) the Solicitation was materially defective in requiring compliance with PREA without discussions or other clarifications regarding this requirement.  Bannum also moved for a preliminary injunction prohibiting BOP from allowing Dismas to proceed with Contract performance pending final resolution of this case on the merits.

On February 20, 2014, the Court granted Dismas' motion to intervene.  With Contract performance set to begin on March 1, 2014, the Court expedited consideration of the matter, treating Bannum's motion for preliminary injunction as a motion for a TRO/preliminary injunction.

On February 23, 2014, Defendant filed a motion to dismiss, or alternatively, an opposition to Bannum's motion for preliminary injunction.  Defendant argues that Bannum had waived its right to challenge the Solicitation's requirement for PREA compliance under Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007) by waiting to raise this allegation until after award.  In addition, Defendant argues that Bannum lacked standing because it qualified its pricing proposal, rendering its proposal noncompliant with the terms of the Solicitation, and that BOP's extension of the 120-day period for commencing operations was a matter of contract administration that could not be protested.

On February 23, 2014, Intervenor filed an opposition to Bannum's motion for a preliminary injunction and a motion to dismiss for lack of standing.  Dismas Mot. Dismiss ("Dismas Mot.") 1, Feb. 23, 2014.

On February 24, 2014, the Court held an evidentiary hearing on the motion for TRO/preliminary injunction and heard oral argument on the parties' motions.  On February 26, 2014, the Court orally denied Bannum's motion and dictated summary findings into the record.

## Discussion

## Jurisdiction and Standard of Review

This Court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2012).  Injunctive relief is an extraordinary remedy.  United States v. John C. Grimberg Co., 720 F.2d 1362, 1372 (Fed. Cir. 1983); Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993) (stating that a preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted").  In deciding whether temporary injunctive relief should issue, a court considers whether a plaintiff establishes by a preponderance of the evidence that:  1) plaintiff is likely to succeed on the merits of the case; 2) plaintiff will suffer irreparable harm if the court withholds injunctive relief; 3) the balance of hardships to the respective parties favors the grant of injunctive relief; and 4) it is in the public interest to grant injunctive relief.  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citation omitted); FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).  "No one factor is dispositive, and 'the weakness of the showing of one factor may be overborne by the strength of others.'"  Gentex Corp. v. United States, 58 Fed. Cl. 634, 654 (2003) (quoting FMC Corp., 3 F.3d at 427).  Because the motion must be resolved immediately at the TRO phase of a bid protest, the record is necessarily truncated.  Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 239 (2010).

A plaintiff that fails to demonstrate a likelihood of success on the merits of its claim is not entitled to a preliminary injunction.  Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir. 2004) (footnote and citation omitted); Int'l Res. Recovery, Inc. v. United States, 64 Fed. Cl. 150, 164 (2005).

## Likelihood of Success On The Merits

### Lack of Standing

The Tucker Act confers jurisdiction on this Court "to render judgment on an action by an interested party objecting to a solicitation . . . or award . . . ."  28 U.S.C. § 1491(b)(1) (2012).  Hence, only an "interested party" has standing to object to a solicitation or award in this Court.  "Standing is a question of subject matter jurisdiction . . . ."  Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013) (citing S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1328 n.3 (Fed. Cir. 2005)) (equating the Tucker Act's "interested party" requirement with "Article III's 'concrete and particularized injury' requirement."); see also Night Vision Corp. v. United States, 68 Fed. Cl. 368, 392 (2005) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)), aff'd, 469 F.3d 1369 (Fed. Cir. 2006).  Jurisdiction is a threshold issue that the Court must address before examining the merits.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) (citation omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

The party invoking jurisdiction "bears the burden of establishing [the] elements [of standing]."  Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (alterations in original) (quoting Lujan, 504 U.S. at 561).  To have standing as an interested party, the party invoking jurisdiction must be "an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)).  "To prove a direct economic interest, a party must show that it had a 'substantial chance' of winning the contract."  Id. (citing Rex Serv. Corp., 448 F.3d at 1308).

The Government contends that Bannum did not have a substantial chance of winning the Contract because its proposal was nonresponsive since the Solicitation required firm-fixed unit prices, but Bannum expressly represented that its prices did not reflect pricing for PREA compliance.  In the same vein, Dismas argues that "[a]n offeror that submits a non-compliant offer has no standing to protest an award[] because it has no chance of receiving the award."  Dismas Mot. 5 (citing A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 138 (2006)).

The Government and Dismas are correct.  In response to Amendment 005, which added the requirement for compliance with PREA, Bannum submitted a letter labeled "Final Proposal Revision #3 and AGENCY PROTEST," and included a footnote commenting on its pricing for PREA compliance that stated:

> However, these prices do not, and cannot, reflect any consideration for the effects of Amendment 5 that BOP presented with this [Final Proposal Revision] #3.  As is discussed elsewhere in this response to the [Final Proposal Revision], it is not remotely possible to begin to attempt to formulate a cost or price proposal for the addition of PREA and its requirements at this point in time and with the limited

amount of information we have been given, not to mention the lack of any technical guidance on this new requirement. Accordingly, an enormous amount of information is required prior to pricing this new contract requirement which itself may require untold amounts of extra work time, services, efforts, and perhaps the necessity for consultants, auditors, not to mention additional executive and management level staffing and effort. Bannum hereby requests that discussions continue on this requirement and that we be provided an[] adequate opportunity to respond to the new requirement and to amend our proposal as needed.

PX 25 at 000001 n.1. After requesting additional information regarding how BOP would assess PREA compliance, Bannum protested "the inclusion of the PREA portion of Amendment 5 into the solicitation subject to the discussion herein and lack of information, specifications and technical guidance from BOP." Id. at 000006 (emphasis omitted). In executing Amendment 005, Bannum included a handwritten note stating: "Subject to and limited by Bannum's response to [Final Proposal Revision] #3 dated 3/7/2013 and submitted herewith; also, subject to Bannum's reservation of all rights and protest." Id. at 000008. In its final proposal revision Bannum reiterated its footnote stating its pricing did not include pricing for the new PREA requirements. Def.'s Mot. App. 199 n.1.

Bannum's proposal with its footnoted pricing caveat does not constitute an offer that the Government could accept. There was no meeting of the minds. Bannum made clear it would need to formulate a price proposal for the addition of PREA compliance and that its offer did not include such pricing. The Government, however, made compliance with PREA mandatory and sought firm-fixed pricing for the entirety of the Solicitation's requirements -- not pricing for everything except PREA compliance. The Solicitation required unit pricing representing the daily price to maintain an inmate at the RRC. Because Bannum omitted pricing for PREA compliance, its offer was nonresponsive and could not form the basis of an award. See PX 25; Def.'s Mot. App. 199.

Bannum contends that its bid was not qualified, as it submitted a specific price that would have bound Bannum had its bid been selected. Pl.'s Resp. Add'l Auth. 1, Feb. 25, 2014. In this Court's view, given Bannum's responses to Final Proposal Revisions 3 and 4, Bannum had represented that its pricing did not encompass PREA compliance and injected uncertainty as to whether it would comply with PREA. In arguing its pricing was not qualified, Bannum relies upon the statement in the Source Selection Decision that Bannum's price was fair and reasonable. The fact that the Source Selection Authority did not deem Bannum's offer nonresponsive does not, however, preclude this Court from assessing the responsiveness of Bannum's offer in the context of examining Bannum's standing.

To the extent that Bannum suggests that this Court cannot deviate from the arbitrary and capricious standard of review in determining standing, Bannum misunderstands the parameters of this Court's ability to determine its jurisdiction. It is true that under § 1491(b)(4) this Court must review the agency's procurement decision pursuant to the standards set forth in the Administrative Procedure Act in section 706 of Title 5. In assessing Bannum's standing however, this Court is not reviewing the decision of an agency but is making a threshold determination as to whether it can hear this case. See Steel Co., 523 U.S. at 94 (citation omitted) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of

announcing the fact and dismissing the cause.'"); Labatt Food Serv. v. United States, 577 F.3d 1375, 1378-79 (Fed. Cir. 2009) (citing Myers, 275 F.3d at 1369-70 ("[S]tanding is a threshold jurisdictional issue.")). A plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence" and must present "competent proof" and demonstrate affirmatively that the Court has jurisdiction. Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936). The jurisdictional determination here is predicated on whether Bannum had a substantial chance of award and not on the review of an agency decision. In contrast to the Court's limited scope of review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, "[f]act-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged." Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999). Thus, contrary to Bannum's suggestion, in assessing standing, this Court is neither bound by the finding in the Source Selection Decision nor the APA standard of review.

In sum, because Bannum expressly represented that its pricing did not cover a mandatory requirement, the cost of PREA compliance, its proposal was not responsive to the Solicitation's requirement for firm-fixed prices covering all requirements. As such, award cannot be made to Bannum. While it appears to the Court that this action is subject to dismissal for lack of standing -- which certainly militates against finding a likelihood of success on the merits -- the Court deems it prudent to examine Bannum's protest grounds and assess their likelihood of success on the merits.

### BOP's Alleged Relaxation Of A Solicitation Requirement and the Awardee's Alleged Material Misrepresentation

Bannum alleges that BOP improperly relaxed the mandatory Solicitation requirement that performance commence within 120 days of award. Although BOP awarded the contract to Dismas on August 26, 2013, the agency did not require performance to commence until February 1, 2014 -- 38 days later than the date Bannum claims the Solicitation required, i.e., December 24, 2013. Further compounding this alleged illegality was the agency's additional post-award extension of the start date until March 1, 2014. Bannum contends that by extending the commencement date for Dismas, BOP improperly skewed the playing field in favor of Dismas and required offerors to meet different start date requirements. Bannum further makes the serious allegation that Dismas materially misrepresented its ability to commence performance within 120 days of award. The evidence before the Court at this juncture does not bear out these allegations.[5]

Section L.6(j) of the Solicitation stated in pertinent part: "Contract performance will be 120 days after the date of contract award, unless otherwise specified by the Contracting Officer." PX 1 at 000034 (emphasis added). Contrary to Bannum's allegation, the Solicitation did not mandate a hard-and-fast deadline by which contract performance had to occur. Rather, the

---

[5] Because Dismas' Contract is set to begin on March 1, 2014, and transition was to begin on February 27, 2014, the Court conducted an evidentiary hearing just four calendar days after Bannum filed the case and authorized the parties to present testimony and documentary evidence as well as argument on the motions. Despite the expeditious scheduling, the parties were well prepared and presented a fairly robust paper record as well as the comprehensive testimony of the contracting officer.

Solicitation clearly authorized the contracting officer to "otherwise specify" a date to commence contract performance. As such, by setting performance to commence on February 1, 2014, instead of on the 120th day after award -- December 24, 2013 -- BOP did not relax a solicitation requirement or deprive Bannum of the opportunity to compete on a fair and level playing field.

While the Solicitation indicated that the ability to commence performance within 120 days was important and that offerors would be evaluated on their ability to meet such a schedule, the Solicitation also expressly permitted the contracting officer to deviate from the 120-day post-award performance start date. As such, this is not an example of an agency accepting a proposal that did not meet the solicitation's minimum mandatory requirement as in Candle Corporation v. United States, 40 Fed. Cl. 658, 665 (1998). Both Bannum and Dismas represented that they could meet the 120-day deadline for commencing performance, and there was nothing in either proposal to suggest to the agency that either offeror could not meet its schedule.

Nor did the agency change a requirement of the Solicitation thereby necessitating an amendment to the Solicitation to afford offerors an opportunity to revise their proposals. The provision in the Solicitation that the awardee commence performance within 120 days of contract award was subject to exception by the contracting officer if she "otherwise specified." Extending the 120-day period under these circumstances was not a change to the Solicitation -- it was an eventuality fully contemplated by the original Solicitation.

Moreover, the contracting officer articulated a sound rationale for scheduling the commencement of contract performance when she did:

> The reason for the change [beyond the 120 days] was due to BOP's usual practice of commencing contract performance on the first day of the month following the 120-day deadline, as a method to streamline contract administration tasks and simplify budgeting and accounting. Here, the 120 days ended the day before a federal holiday (Christmas) and the first day of the next month fell on another federal holiday (New Year's Day). To avoid moving inmates on Christmas Eve or New Year's Day, and since Bannum's incumbent contract in Tupelo would run through February 1, 2014, the contracting officer unilaterally set February 1 as the start date.

Def.'s Mot. App. 269-70 (citations omitted).

This Contract involves moving federal offenders to a halfway house, and the logistics of effecting such moves are complex and require extensive coordination. See Def.'s Mot. App. A273-78 ¶¶ 4-5, 7-16. The contracting officer's assessment that it would be preferable not to effect such moves on Christmas Eve or New Year's Day was well within her discretion and consistent with the Solicitation and Dismas' Contract. So too, the contracting officer's decision to extend the start date until March 1, 2014, was within her discretion as it was prompted by the GAO stay and the ensuing stop work order. The contracting officer reasonably coordinated with Dismas to ascertain when Dismas could commence performance once the 97-day stop work order, spanning September 6, 2013 to December 12, 2013, was lifted.

Bannum further alleges that "Dismas's proposal contained a material misrepresentation . . . that its facility would be ready by the originally specified commencement date of December 24, 2013, or at least by the extended date of February 1, 2014." Pl.'s Mot. 7.

To establish material misrepresentation, a plaintiff must show that an offeror's misrepresentation was material and that the agency relied on the misrepresentation in awarding the offeror a contract. Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 495 (2006) (citation omitted), aff'd, 492 F.3d 1308 (Fed. Cir. 2007); GTA Containers, Inc. v. United States, 103 Fed. Cl. 471, 483 (2012) (citations omitted).

The record before the Court does not establish that Dismas materially misrepresented its ability to commence performance within 120 days of contract award. Bannum argues that Dismas materially misrepresented its "120 Day Plan for Availability" in its February 21, 2013 submission to BOP by stating "Construction Documents & Permitting Approvals [for the proposed facility were] completed" and that the City of Tupelo had approved its "construction documents and drawings." Bannum would have this Court conclude that because Dismas did not receive its building permit until August 27, 2013, and its Certificate of Occupancy until February 11, 2014, that Dismas must have misrepresented that its construction documents, drawings, and permitting had been approved in its February 21, 2013 response. Such a conclusion however would lack an evidentiary predicate and be speculative because the construction documents, drawings and permits referenced in this response are not before the Court. It is not clear what documents Dismas was referencing in that submission or what documents Dismas claimed had been approved as of that date.[6]   Moreover, the Solicitation only required that the awardee's facility would comply with applicable laws, regulations, Executive Orders and building codes once the facility was operational at the commencement of performance. PX 1 at 000011 § F.3, 000068-69.

**Waiver Of Bannum's Claim Challenging The Solicitation And The Alleged Defect In The Solicitation**

**Bannum Did Not Waive Its Right To Challenge The Solicitation**

Bannum contends that the Solicitation was rendered materially defective by virtue of BOP's incorporation of the PREA requirements and thus could not serve as the basis for a contract award. The Government and Dismas argue that Bannum waived its right to challenge the Solicitation's requirement for PREA compliance under Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007), because it waited until after award to raise this allegation. Bannum however filed a letter dated March 7, 2013, over five months before award, labeled "Response to Final Proposal Revision #3 and AGENCY PROTEST," stating that it was protesting "the inclusion of the PREA portion of Amendment 5 into the solicitation subject to the discussion herein and lack of information, specifications and technical guidance from BOP." PX 25 at 000006.

The Government and Dismas argue that Bannum's March 7, 2013 letter could not be considered an agency-level protest because it failed to conform to the requirements of FAR 33.103(d)(2). Even if this letter could be deemed an agency-level protest, the Government and Dismas contend that Bannum waived its claim under Blue & Gold because it did not file a pre-award protest with GAO or this Court after Bannum failed to receive a decision from BOP

---

[6]   Bannum also claims that Dismas misrepresented its compliance with environmental requirements, but the record does not establish either that Dismas' statements were material misrepresentations or that Dismas was noncompliant with environmental requirements.

regarding Bannum's "protest" -- after there was a deemed denial from BOP.  Def.'s Mot. 15-18; Dismas Mot. 11-13.  Dismas further contends Bannum waived its claim because it failed to raise this issue during its GAO protest.

In Blue & Gold, the United States Court of Appeals for the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."  492 F.3d at 1315.  The policy underlying this waiver rule is clear:

> It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation.  Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.

Id. at 1314 (alteration in original) (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005)).  In COMINT Systems Corporation v. United States, the Federal Circuit acknowledged that the Blue & Gold waiver rule should be broadly applied in bid protests, holding that "the reasoning of Blue & Gold applies to all situations in which the protesting party had the opportunity to challenge a solicitation before award and failed to do so."  700 F.3d 1377, 1382 (Fed. Cir. 2012).  Thus, under COMINT, a protestor may raise a challenge to a solicitation any time prior to award -- a time frame that may be beyond the close of the bidding process.

Defendant and Intervenor interpret the Blue & Gold waiver rule to require a protestor to pursue a formal pre-award protest with the agency, GAO or this Court.  Neither Blue & Gold nor COMINT however stands for the proposition that a protestor must file a formal protest to preserve its right to challenge a solicitation.  In articulating the waiver rule and confirming its broad application in bid protests, the Federal Circuit only required that a protestor "object to" or "challenge" a solicitation containing a patent ambiguity or error before award.  Blue & Gold, 492 F.3d at 1315; COMINT, 700 F.3d at 1382.  The Federal Circuit did not articulate any specific procedural requirements for such a challenge or objection or suggest that a protestor would have to pursue a formal protest remedy pre-award.  The point of the waiver rule is to provide notice to the agency so that it can remedy a defective solicitation before award.  Allowing informal notice in raising pre-award issues permits the expeditious amendment of problematic solicitations or, if the agency is satisfied its solicitation is adequate, an expeditious continuation with the award process at hand.  At present, the law does not require that Bannum do anything more than it did here.  All that is required is that a protestor must have "done something" to challenge a solicitation prior to award to preserve its right to protest the solicitation in this Court.  DGR Assocs., Inc. v. United States, 94 Fed. Cl. 189, 202-04 (2010) ("All [Blue & Gold] says is that a party must have done something prior to the closing date to protest the solicitation error, before raising 'the same objection . . . subsequently in the Court of Federal Claims.'" (quoting Blue & Gold, 492 F.3d at 1313)).

Here, Bannum clearly objected to the incorporation of the PREA compliance requirements into the Solicitation in its March 7, 2013 letter to the contracting officer.  Whether or not it properly constituted an agency protest, Bannum's letter objected to the incorporation of PREA into the Solicitation and unequivocally sought clarification regarding the scope of any

additional work required and warned that it needed guidance before it could price its compliance. In its March 7th letter, Bannum both "objected to" and "challenged" this Solicitation as required by Blue & Gold and COMINT. Bannum did not sit on its rights but instead elaborated in detail on its problems with the PREA compliance requirements incorporated by Amendment 005. As such, Bannum did not waive its right to challenge this Solicitation.

### The PREA Requirements Did Not Render The Solicitation Defective

Bannum claims that the requirement that offerors comply with PREA rendered the Solicitation defective because BOP did not give any guidance regarding the implementation of the PREA requirement and thus made it impossible for an offeror to develop a PREA compliance plan, determine the scope of the work required, or calculate the cost impact.

While Bannum may have had legitimate questions about PREA compliance, it has not demonstrated that the incorporation of PREA without further elaboration by BOP rendered the Solicitation defective. Many solicitations require compliance with statutes without offering guidance on how compliance must be achieved. This Solicitation did not require a description in the proposal to explain how compliance with PREA would be met or require a specific deliverable.[7] Nor did the Solicitation contain any provisions regarding evaluating offerors on whatever policies, programs or activities they might undertake to effect compliance.

The Solicitation's silence on these points left the particulars of PREA compliance and its pricing up to offerors. The Solicitation called for firm-fixed unit prices before Amendment 005 was issued and persisted in calling for that same type of unit pricing after Amendment 005 was issued. PX 1 at 000006; see PX 2 at 000150-51 ¶ 14.

BOP was apparently not persuaded by Bannum's arguments that it needed discussions and substantial additional information to figure out how to comply with PREA and what to charge for such compliance. The agency's lack of response to Bannum's agency protest meant that the Solicitation, including Amendment 005, stood as it was and that the agency expected offerors to comply with PREA and revise their pricing accordingly. The lack of guidance on methods of compliance did not render the Solicitation defective or make it impossible for offerors to submit responsive offers. Indeed, Dismas, in responding to Amendment 005, stated,
[                                                    ]  PX 24. While Bannum complained that it was impossible to calculate its PREA costs further information, the agency, by not elaborating on PREA requirements, rejected Bannum's argument. So too, the agency continued to require that all offerors include PREA compliance costs in their pricing -- as indicated by Final Proposal Revision # 4's call for final proposals, expressly stating that "the Government intends to make award without further revisions." Def.'s Mot. App. A204-05.

The bottom line is that BOP's silence meant that Bannum had to figure out how to comply with PREA itself and include any additional costs in its revised firm-fixed unit prices. Bannum did not do that, and its tack of essentially telling BOP "this PREA compliance is going to cost you but we don't know how much" backfired. Bannum's express failure to include

---

[7]    The Court recognizes that Amendment 005 required the contractor post-award to maintain a policy addressing PREA compliance, identify a PREA auditor and furnish a certified PREA compliance auditor at its cost during performance. PX 2 at 000151 § 14.

pricing for a mandatory requirement in its firm-fixed unit prices rendered its proposal nonresponsive.  While the Government may have been better served to enlighten offerors as to what it expected regarding PREA compliance in these Residential Re-entry Centers, its failure to engage in discussions or elaborate on compliance techniques did not render the Solicitation defective.

Bannum has failed to demonstrate a likelihood of success on the merits and is thus not entitled to injunctive relief.  As such, this Court need not address the other factors for injunctive relief.  See Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d at 1325 ("[A] district court cannot use an exceptionally weighty showing on one of the other three factors to grant a preliminary injunction if a movant fails to demonstrate a likelihood of success on the merits."); see also KSD, Inc. v. United States, 72 Fed. Cl. 236, 268 (2006) (denying preliminary and permanent injunction without addressing the other factors for injunctive relief after finding that plaintiff did not prove that the Government's actions were arbitrary, capricious, or otherwise not in accordance with the law or that plaintiff was prejudiced).

**Conclusion**

Plaintiff's motion for a TRO/preliminary injunction is **DENIED**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**